UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-cv-20693-ALTMAN

**QR TRIPTYCH, LLC**,

    *Appellant*,

*v.*

**LV MIDTOWN, LLC**,

    *Appellee.*

_____/

**ORDER**

Our Appellant, QR Triptych, LLC ("QR"), has appealed the Bankruptcy Court's Enforcement
Order,[1] which resolved a dispute over an undeveloped commercial lot (the "Property") in a valuable
part of Miami. The dispute began when the Property's former owner, Aventura Hotel Properties, LLC
("Aventura"), defaulted on the priority mortgage held by our Appellee, LV Midtown, LLC ("LV").
LV filed a foreclosure action in state court against Aventura and QR (which held a subordinate
mortgage). Aventura responded by filing for Chapter 11 bankruptcy protection. LV and Aventura
eventually resolved the bankruptcy action through a court-approved settlement that culminated in a
Sale Order allowing LV to purchase the Property with a credit bid (meaning that QR received nothing).

Meanwhile, QR sued LV in state court for allegedly breaching the "Subordination and
Intercreditor Agreement" QR and LV had signed.[2] In that state-court case, QR initially sought money
damages. But it later moved for leave to file *both* (1) an amended complaint that demanded specific

---

[1] Bankruptcy Judge Robert Mark issued the Order Granting in Part Motion to Enforce on February
22, 2022. *See* Enforcement Order [ECF No. 13-21].

[2] We'll refer to this as the "Intercreditor Agreement." It hasn't—as far as we can tell—been filed on
our docket. *See generally* Docket. It can, however, be found on one of the two state-court dockets we'll
introduce later. All that said, the Intercreditor Agreement's contents are peripheral to the issues we
adjudicate here.

performance and an equitable lien *and* (2) a notice of *lis pendens* against the Property. Seeing this proposed amendment, LV asked the Bankruptcy Court to enforce the terms of the Sale Order, which (LV argued) QR had violated by seeking *in rem* relief against the Property (rather than the *in personam* relief the Sale Order had unambiguously contemplated). The Bankruptcy Court granted LV's motion in relevant part and issued the Enforcement Order, which—among other things—prohibited QR from seeking certain forms of *in rem* relief against the Property. QR has appealed the Enforcement Order to us, contending that its claims against LV in state court were not *in rem*, and that—as a result— the Enforcement Order precluded it from pursuing remedies the Sale Order had left available.

LV responded by filing the Motion to Dismiss Appeal as Moot (the "MTD") [ECF No. 15]— which we resolve here—arguing that, since it has since sold the Property to a third party, any decision by us reversing the Enforcement Order "would not afford QR any meaningful relief," MTD at 1–2. In its Response to LV's Motion to Dismiss Appeal as Moot (the "MTD Response") [ECF No. 19], QR suggests that the third-party purchaser of the Property *may* not have been a *bona fide* purchaser for value and that, *if* this turns out to be true, our reversal of the Enforcement Order would allow QR to seek against the purchaser in state court the same remedies it had sought against LV. The MTD ripened on July 7, 2022, when LV filed its Reply in Support of Motion to Dismiss Appeal as Moot (the "MTD Reply") [ECF No. 20].[3]

We ultimately agree with LV: QR's Appeal of the Enforcement Order is moot because a favorable decision by us wouldn't redress QR's injuries. Instead, it would just allow QR to live to fight another day (in state court).[4] And that's not good enough. After careful review, then, we **GRANT** LV's MTD [ECF No. 15] and **DISMISS** QR's Appeal [ECF No. 1].

---

[3] We can (and do) adjudicate this MTD based on the facts *as they were* when the MTD became ripe on July 7, 2022. That said, we will not ignore the events that have transpired since—which have made QR's Appeal "doubly" moot. *See infra* at 20, 27–29.
[4] As we'll discuss in more detail below, these state-court doors have been permanently closed to QR in any event. *See infra* at 24–26.

2

THE LAW

"The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under [28 U.S.C. § 157]." 28 U.S.C. § 158(a)(1); *see also In re Colortex Indus., Inc.*, 19 F.3d 1371, 1374 (11th Cir. 1994) ("[T]he district court in reviewing the decision of a bankruptcy court functions as an appellate court[.]"). In doing so, we "review the bankruptcy court's legal conclusions *de novo* but must accept the bankruptcy court's factual findings unless they are clearly erroneous." *In re JLJ, Inc.*, 988 F.2d 1112, 1116 (11th Cir. 1993) (cleaned up); *see also In re Thomas*, 883 F.2d 991, 994 (11th Cir. 1989) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." (cleaned up)); *L. Sols. of Chi. LLC v. Corbett*, 971 F.3d 1299, 1304 (11th Cir. 2020) (noting that "the district court" may not "make independent factual findings"). "An appeal is moot if events have occurred after the entry of the [bankruptcy] order being appealed that prevent an appellate court from granting effective relief." *In re Dynamic Brokers, Inc.*, 293 B.R. 489, 493–94 (9th Cir. BAP 2003).

FACTUAL AND PROCEDURAL HISTORY

## I.      LV files a foreclosure action against Aventura, which then files for bankruptcy

On July 31, 2018, "LV extended a loan to [Aventura], which was secured by a first priority mortgage against the Property." MTD at 4. That same day, LV and QR—which held a "junior and subordinate mortgage lien on the Property," *ibid.*—entered into the Intercreditor Agreement, *see* MTD Response at 5. Under the terms of that agreement, LV "agreed to provide a default notice . . . to [QR] if [Aventura] defaulted," and QR "was granted the option to purchase [LV's] indebtedness." *Ibid.*

3

Aventura did default, and LV filed a foreclosure action in Florida state court against Aventura as "Borrower" (and against QR as "Junior Lienholder") on September 2, 2020.[5] *See* State-Court Verified Complaint for Foreclosure and Other Relief [State Foreclosure Docket Entry ("DE") No. 3]. In this Foreclosure Action, LV asserted three claims: "Damages for Breach of Note (against Borrower)" (Count I); "Mortgage Foreclosure (against all Defendants)" (Count II); and "Foreclosure of Security Agreement (against all Defendants)" (Count III). *Id.* at 6–8. QR responded by filing an Answer, Affirmative Defenses, and a Crossclaim [State Foreclosure DE No. 13]. As an affirmative defense, QR claimed that it was "entitled to any and all surplus funds received from the foreclosure sale of the Property after [LV] . . . pursuant to the Subordination and Intercreditor Agreement." *Id.* at 5. And, as a crossclaim, QR alleged that Aventura had *also* defaulted on QR's $8,238,579.20 loan. *See id.* at 6–11.

On January 8, 2021, LV filed in state court its Motion for Final Summary Judgment of Foreclosure [State Foreclosure DE No. 30]. But, on March 12, 2021, just before the state court held a hearing on that motion, Aventura (and Triptych Miami Holdings, LLC[6]) filed Chapter 11 bankruptcy

---

[5] This action was filed in the Eleventh Judicial Circuit in and for Miami-Dade County, and we'll refer to it as the "State Foreclosure Action." *See LV Midtown LLC v. Aventura Hotel Props., LLC, et al.*, No. 2020-018857-CA-01 (23) (Fla. 11th Jud. Cir. Sept. 2, 2020). The filings are publicly available at www2.miamidadeclerk.gov. When we're resolving a motion to dismiss, we may take judicial notice of state-court proceedings and pleadings. *See Talley v. Columbus, Ga. Hous. Auth.*, 402 F. App'x 463, 465 n.4 (11th Cir. 2010) ("Although the district court was ruling on a motion to dismiss, the court properly examined extrinsic documents detailing [the plaintiff's] previous state and federal court cases[.]"); *see also Cave v. Stone*, 2021 WL 4427451, at *1 (S.D. Fla. Sept. 27, 2021) (Altman, J.) ("Even if the Motion [to Dismiss] hadn't advanced a factual challenge under Rule 12(b)(1), though, we'd likely take judicial notice of these extrinsic documents anyway. Federal Rule of Evidence 201 permits a federal court to take judicial notice of state-court records because, generally, those records 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" (quoting FED. R. EVID. 201(b))). And we do so here.
[6] Triptych Miami Holdings, LLC, is a "parent company" of Aventura that appears to be distinct from QR. *See* Aventura's Form 201 [Bankruptcy ECF No. 1] at 2; *see also* MTD at 4 ("On March 12, 2021, [Aventura] and its parent company filed a voluntary petition in the Bankruptcy Court for relief under chapter 11[.]"). The presence of Triptych Miami Holdings, LLC, in this factual and procedural history—while otherwise irrelevant—explains why the parties and courts occasionally refer to *multiple* "debtors."

petitions in our District.[7] Seeing the bankruptcy filings, the state court stayed the Foreclosure Action

on March 16, 2021. *See* Order Placing Case on Inactive Status [State Foreclosure DE No. 50].

## II.      The Bankruptcy Court approves a settlement between Aventura and LV

In its bankruptcy filings, Aventura listed the Property as its only piece of real property, valuing

it at $42 million. *See* Form 206A/B [ECF 13-1] at 8. LV filed a proof of claim in the amount of

$18,944,582.14, and QR filed a proof of claim in the principal amount of $8,240,000, which it later

amended to $10,597,809.81. *See* Motion to Enforce Order Authorizing Sale of Real Property [ECF

No. 13-17] at 5.

On June 4, 2021, the Debtors (Aventura and Triptych Miami Holdings) filed an Expedited

Motion to Approve Settlement and Compromise with Secured Creditors [LV] (the "Settlement

Motion") [ECF No. 13-3], which would "resolve[ ] the Debtors' potential objection to Secured

Creditors' claims and [would] obtain[ ] the Secured Creditors' consent for an orderly liquidation or

reorganization of the Debtors' affairs," Settlement Motion ¶ 1. The Debtors and LV agreed that the

"Payoff Amount" would be $20,468,837.91, but that LV would accept a "Release Price" of

$19,600,000 if certain conditions were met. *Id.* at 4. The Settlement Motion also allowed LV to place

a "credit bid" on the Property in the amount of $19,600,000, and it named LV as a potential "stalking

horse" purchaser of the Property. *Id.* at 4–6. "If the sale produced a surplus above the Payoff Amount

those funds would be paid into the bankruptcy estate." QR Initial Brief at 16. The Settlement Motion

set a six-week sale process. *See* Settlement Motion at 5.

QR opposed the Settlement Motion. *See* Response of QR in Opposition to the Settlement

Motion ("QR Settlement Motion Response") [ECF No. 13-4]. According to QR, "[t]he proposed

Settlement Agreement is the functional equivalent of a Chapter 11 plan, and it should not have been

---

[7] Aventura's bankruptcy case (Case No. 21-bk-12374) was assigned to Southern District of Florida
Bankruptcy Judge Robert Mark. So, too, was Triptych Miami Holdings, LLC's bankruptcy filing (Case
No. 21-bk-12375). For our purposes, only Aventura's bankruptcy case is relevant.

set for hearing on shortened notice. The Expedited Settlement Motion provides insufficient disclosure of (a) the actual or potential claims, defenses and objections that the Debtors are waiving, and (b) the manner in which LV's secured claim has been calculated." *Id.* ¶ 9. Plus, QR continued, "the proposed Settlement Agreement ignores the rights of QR under its Intercreditor Agreement with LV." *Ibid.* Because "LV failed to comply with one of the only protections [notice] offered by the Intercreditor Agreement," QR insisted that it had been "'sand-bagged.'" *Id.* ¶ 16. In their reply, the Debtors reassured QR that "the Settlement Motion does not impair any claims between [LV] and [QR]." Debtors' Response in Opposition to Motion of QR [ECF No. 13-5] ¶ 2.

The Bankruptcy Court considered the Settlement Agreement at a June 17, 2021, hearing. *See* Settlement Agreement Hearing Transcript [ECF No. 13-6]. At that hearing, Debtors' counsel told the Bankruptcy Court that a "broker was retained . . . to put together a sale process that would maximize both the value of the property and take advantage of what is a very hot real estate market in Miami right now," *id.* at 9:11–16, and that "over 40 groups [had] executed confidentiality agreements and . . . done due diligence on the property," *id.* at 10:4–8. In addition, "counsel for the Debtors, counsel for LV, and the Court, all affirmed that the Court's granting of the Settlement Motion would not have a negative impact on QR's claims against LV in the state court litigation." QR Initial Brief at 18. Specifically, Aventura's counsel said that, "[i]f there are claims between [LV] and [QR], those two parties are free to litigate between themselves," Settlement Agreement Hearing Transcript at 13:16–18, and that, "if there was any improvident action taken by [LV], whatever rights QR has under that [Intercreditor Agreement], it can assert those rights," *id.* at 53:8–10. Counsel for LV likewise agreed that "[t]here's not an intention to bind—to prevent QR from bringing a damages claim, to the extent that it believes it had one under the [Intercreditor Agreement]," *id.* at 44:17–19, and that "[i]t's not our position that [the Settlement Motion] limits QR's rights under [the Intercreditor Agreement] outside of this proceeding," *id.* at 53:13–15. And, when QR's counsel said that "my understanding is that . . .

if QR does have claims against LV for breach of the intercreditor agreement, that they can pursue those claims in state court [and that] QR simply would not be barred by the ruling from pursuing claims in state court that do not impact the sale process and the distribution process in this court," the Bankruptcy Judge replied: "I think that was clear from the start." *Id.* at 55:8–19.

The Bankruptcy Court approved the Settlement Agreement on June 23, 2021. *See* Order Granting Debtors' Motion to Approve Settlement and Compromise with [LV] [ECF No. 13-7]. In that order, the Bankruptcy Court noted that "the Settlement Agreement and this Order shall neither impact [QR's] ability, if any, to assert available counterclaims, crossclaims, or defenses in the Foreclosure Case (or the ability of the Debtors or [LV] from opposing the same) nor bar any independent claims that [QR] may have against [LV] (or vice-versa) or other parties." *Id.* at 2.

### III.    The Bankruptcy Court issues a Sale Procedures Order

On July 15, 2021, the Debtors moved for the Bankruptcy Court to "enter an Order: (i) authorizing [Aventura] to sell the Property free and clear of all liens, claims, and encumbrances, pursuant to 11 U.S.C. § 363; (ii) approving the Contract, subject to better and higher offers; (iii) approving the Bidding Procedures and sale process; [and] (iv) setting a Sale Hearing and/or Auction date on or before August 23, 2021[.]" Debtor's Motion for Entry of an Order Authorizing the Sale [ECF No. 13-8] at 1. A few days later, QR filed an Objection [ECF No. 13-9]. "Because QR's rights against LV already were preserved by the Settlement Order and the Sale Motion did not include any provisions relating to QR's claims against LV, QR's objection to the Sale Motion was a limited one"— pertaining only to whether any excess sale proceeds "would be held in escrow pending the resolution of the Debtors' claims against QR." QR Initial Brief at 20–21.

On July 29, 2021, the Bankruptcy Court entered the "Sale Procedures Order" [ECF No. 13-10], which "set an auction sale date, set bidding procedures, and confirmed LV's right to credit bid up to the amount of $19.6 million," QR Initial Brief at 21. "The Sale Procedures Order resolved [QR's]

Sale Objection [regarding escrow]." *Ibid.* Accordingly, "QR did not appeal the Sale Procedures Order." MTD at 5. As it made clear, QR "hoped that the sale would produce a surplus because QR believed it would receive all or most of the surplus by virtue of its second mortgage position." QR Initial Brief at 21.

### IV.     LV—the only bidder—purchases the Property

Once the Bankruptcy Court issued the Sale Procedures Order, "the Debtors marketed the Property and did not receive any qualifying third-party offers at a price point acceptable to LV to defeat LV's credit bid. The Debtors then applied for entry of an Order approving the sale of the Property to LV for a nominal credit bid by LV in the amount of $10,000." *Id.* at 22. Just before the August 25, 2021, sale hearing, LV—not the Debtors who filed the Sale Motion—submitted an 18-page proposed sale order. *See* Notice of Filing Proposed Order [ECF No. 13-12] at 1; *see also* Proposed Order Authorizing Sale of Real Property [ECF No. 13-12] at 2.

During the August 25, 2021, Sale Hearing, QR's counsel became "concerned that the order could be interpreted to go beyond simply selling the real estate free and clear of interests in the real estate proper, and could be construed to perhaps bar certain kinds of *in personam* claims relating to the property." Sale Hearing Transcript [ECF No. 13-13] at 12:24–13:3. The court therefore asked counsel for LV to "confirm that the order is intended just to deal with liens against the real estate and not *in personam* claims that [QR] may have or otherwise assert." *Id.* at 15:9–11. In response, LV's counsel agreed that "we are looking for what we can get under 363(f) [of the Bankruptcy Code] . . . what [QR] asserted is a contract claim under a subordination agreement against [LV]. That is not a claim against the debtor, and it's not a claim against the property. . . . I don't believe the language would bar that claim . . . the intent is to protect [LV] from claims . . . against the debtor and liens against the property, and not more than that." *Id.* at 15:12–16:6.

QR's counsel also informed the Bankruptcy Court that "[t]here's a number of provisions in here that I think blur the distinction between claims against the property itself and . . . *in personam* claims against the parties." *Id.* at 26:13–18. The Bankruptcy Court responded that "free and clear is really free and clear of . . . liens, claims or interest enforceable against the property, and [that] should be the limit of what LV is getting. I don't think LV is claiming in any way that it's getting released from any *in personam* contract claims or intercreditor agreements or the like." *Id.* at 28:6–12. And LV's counsel confirmed that "a contractual claim against LV independently, not travelling through the debtor or the property, this doesn't seek to enjoin that. . . . [T]he intent is . . . that someone can't sue LV on a theory that we've now acquired the property . . . previously owned by the debtor and that had a claim against the debtor, so now they can't bring it against [LV]." *Id.* at 30:19–31:4. QR was apparently satisfied with these assurances, as it "neither appealed, nor sought rehearing of the Sale Order, and the time for appeal expired prior to title transferring to LV." LV Response Brief at 13.

The Bankruptcy Court approved the Proposed Order Authorizing Sale of Real Property, noting—among other things—the following:

> N. The transfer of the Property to LV shall be legal, valid, and effective transfer of the Property and will vest LV with all right, title, and interest of the Debtors to the Property free and clear of all pledges, liens, security interests, mortgages, leases, subleases, options, rights of use or possession, rights of first offer or first refusal, easements, servitudes, restrictive covenants, encroachments, encumbrances, claims, charges, options, third party interests and other interests or restrictions or limitations of any kind thereon and there against . . . and free and clear of (i) all claims against the Debtors or the Property arising under or out of, in connection with, or in any way relating to, any acts of the Debtor, (ii) all claims, rights and causes of action against LV or any successor or assign arising by virtue of its acquisition of the Property or based on theories of transferee or successor liability under any law, statute or regulation of the United States, any state, territory, or possession thereof or the District of Columbia, and (iii) all claims that the Property is subject to any lien or encumbrance by virtue of any obligations, demands, guaranties, rights, contractual commitments, restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of the Debtor's bankruptcy case, and whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Claims"), in accordance with section 363 of the Bankruptcy Code, with such Interests and Claims to attach to the net proceeds of the sale of the Property[.]

Order Authorizing Sale of Real Property Free and Clear of Liens, Claims and Encumbrances (the

"Sale Order") [ECF No. 13-14] at 8–9. The Sale Order also included these important provisions:

> 7. Pursuant to section 105(a) and 363(f) of the Bankruptcy Code, the Property shall be transferred to LV, and the transfer of the Property to LV hereunder shall constitute a legal, valid, and effective transfer of the Property free and clear of all Interests and Claims of any kind or nature whatsoever, other than the Excepted Interests.

> 8. This Order (a) shall be effective as a determination that, as of the transfer of the Property hereunder to LV, all Interests and Claims of any kind or nature whatsoever existing in or against the Property prior to the transfer of the Property (other than the Excepted Interests[8]) have been unconditionally released, discharged and terminated, and that the conveyances herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities…

> 10. Except for the Excepted Interests set forth in this Order, effective upon the transfer of the Property to LV hereunder, all persons or entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lender, trade and other creditors, holding Interests or Claims of any kind or nature whatsoever against the Debtors or the Property (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, the operation of the Debtors' business prior to the Closing, or the transfer of the Property to LV, hereby are forever barred, estopped, and permanently enjoined from asserting such persons' or entities Interests or Claims against the Property or LV, or its successor or assigns, property, or assets, provided however, that nothing herein shall preclude the assertion, commencement, or continuation against LV of any in personam claims, causes of action, defenses, affirmative defenses, or counterclaims that may exist directly against LV based on any alleged act or omission of LV including, without limitation, QR Triptych, LLC's claim alleging damages caused by LV having allegedly breached the Intercreditor Agreement prior to the petition Date, with any such claims being subject to any defenses, affirmative defenses, or counterclaims that may be asserted by LV.

*Id.* at 13–15.

With the sale approved, the Debtors moved to dismiss their Chapter 11 bankruptcy cases. *See*

Motion for Voluntary Dismissal of Chapter 11 Cases [ECF No. 13-15]. "Despite the best efforts of

the Debtors and their professionals, the sale of the Property did not generate any cash to the estate.

When considering the present economic realities of the bankruptcy estates, dismissal of the

---

[8] The "Excepted Interests" have nothing to do with QR, and QR doesn't argue that they do.

bankruptcy cases is warranted as there is no realistic opportunity for the Debtors to successfully reorganize or, in this instance, propose[ ] a feasible plan of liquidation." *Id.* ¶ 11. The Bankruptcy Court granted the Debtors' motion on October 6, 2021, noting that "all prior Orders . . . shall remain in full force and effect," and that the "Court shall retain jurisdiction to enforce the terms of this Order." Order Granting Debtors' Motion for Voluntary Dismissal of Chapter 11 Cases [ECF No. 13-16] ¶ 8.

### V. QR sues LV in a *new* state case and eventually loses *both* that state action *and* the original foreclosure litigation

On July 28, 2021—one month *before* the sale of the Property to LV—QR sued LV in Florida's Eleventh Judicial Circuit.[9] *See* State-Court Complaint [State Intercreditor DE No. 2]. In that state-court suit, QR alleged:

> In direct violation of the Intercreditor Agreement at issue in this case, LV wholly failed to provide written notice to QR of an alleged default upon which LV later relied to seek foreclosure of the property in question. Written notice was required and would have enabled QR to cure a default or exercise a purchase option of LV's loan. LV's failure to provide notice to QR and later reliance on an alleged event of default has severely damaged QR and its investment, completely depriving QR of its rights under the Intercreditor Agreement. Based on LV's material breach of the Intercreditor Agreement, QR brings this action to make it whole.

*Id.* ¶ 2. QR's complaint advanced a single count—"Breach of Subordination and Intercreditor Agreement"—and sought *only* money damages. *Id.* at 8–10; *see also* LV Response Brief at 14 ("[A]lthough LV contends that QR's lawsuit was without merit, it did not contend that this lawsuit violated the Sale Order. To the contrary, this was the exact *in personam* damages claim against LV that was preserved by the Sale Order (subject to LV's defenses)."). LV responded with a Motion to Dismiss [State Intercreditor DE No. 22].

---

[9] This is *QR Triptych LLC v. LV Midtown, LLC*, No. 2021-018152-CA-01 (Fla. 11th Jud. Cir. July 28, 2021), which we'll refer to as the "State Intercreditor Action." As we did with the state Foreclosure Action, we'll take judicial notice of these state-court proceedings and pleadings. *See ante*, at 4 n.5. This state-court docket is also publicly available at www2.miamidadeclerk.gov.

Meanwhile, on October 18, 2021, back in the since-stayed state Foreclosure Action, QR filed a Motion to Dismiss Case as Moot [State Foreclosure DE No. 52]. According to QR, "[b]ecause LV, through the bankruptcy sale, obtained all the relief it sought in this [foreclosure] action, there is nothing further to litigate in this action." *Id.* ¶ 21. And, "based on the sale of the Property to LV in the Bankruptcy Case, QR's crossclaim [against Aventura] to foreclose its subordinated mortgage is moot as well. . . . [T]he instant action must be dismissed as moot." *Id.* ¶ 23. On October 29, 2021, LV moved to "return [the foreclosure] action to active status" on the ground that the bankruptcy proceedings—which had led to the stay of the Foreclosure Action—had been "terminated" through settlement. Motion to Return Case to Active Status [State Foreclosure DE No. 53] at 1–2.

Several months *after* the Property's sale to LV, on December 15, 2021—while those two motions were pending in the state Foreclosure Action (and as LV's motion to dismiss was pending in the state Intercreditor Action)—QR recorded a *lis pendens* on the Property in the Intercreditor Action. *See* State-Court Notice of *Lis Pendens* [State Intercreditor DE No. 43] ("QR is seeking an equitable lien on the Property based on the apparent and fair nexus between QR's equitable interest in the Property and the dispute embodied in the lawsuit. QR has a good faith and viable claim against LV which affects the Property. LV failed to provide QR Senior Default Notice as required under the Contract attached to the Complaint as Exhibit '1' thereby precluding QR's right to exercise its Purchase Right over the Property pursuant to the occurrence of a Purchase Right Event . . . among other breaches.").

One week after that—on December 22, 2021—QR filed a Motion for Leave to File Amended Complaint [State Intercreditor DE No. 47]. In that proposed Amended Complaint [State Intercreditor DE No. 47, Exhibit B], QR again asserted a "Breach of Subordination and Intercreditor Agreement" claim (Count I)—but it now *also* requested "Specific Performance of the Intercreditor Agreement and Purchase Option" (Count II) and an "Equitable Lien" (Count III). As to Count II, QR asserted that, "[i]n order to prevent LV from benefitting from its own wrongful actions, and in order to effectuate

12

the purpose of the Purchase Option, QR should be permitted to exercise the Purchase Option as to the Property itself for the amount that QR would have been required to pay had LV not breached the Intercreditor Agreement[.]" *Id.* ¶ 52. And, as to Count III, QR said that it "does not have an adequate remedy in the form of money damages because LV is a single asset entity, and it may sell or mortgage the Property, it is actively doing so with [a broker] and is seeking to dissipate its sole asset, before QR is able to enforce a judgment for money damages. Moreover, the Property is real property, considered unique by Florida courts, and equitable relief is available as a remedy for breach of an option to purchase real property." *Id.* ¶ 70.

That same day, QR filed an Amended Notice of *Lis Pendens* [State Intercreditor DE No. 48]. This time, QR clarified that it "is not asserting that it presently holds a mortgage or other lien upon the Property. QR is requesting that the Court . . . impose a lien on the Property in favor of QR based upon equitable considerations, and to preserve QR's ability to obtain effective relief in the event that QR prevails in the action." Amended Notice of *Lis Pendens* at 2; *see also* QR Initial Brief at 26 ("LV is a single asset entity. QR sought the remedies in question because if LV sells the Property before QR's claims are adjudicated, the proceeds may be distributed to LV's members and QR may be deprived of an effective remedy.").

Back in the state Foreclosure Action, the state court dismissed Counts II and III of LV's complaint against QR and Aventura, and it dismissed QR's crossclaim against Aventura. *See* Order on [QR's] Motion to Dismiss Case as Moot [State Foreclosure DE No. 56]. That left only LV's Count I against Aventura for breach of the note. *See id.* ¶ 8.

On February 14, 2022, the state court granted LV's MTD in the Intercreditor Action and dismissed QR's Complaint. *See* Hearing Transcript [State Intercreditor DE No. 70]. In doing so, the state court found that QR was asserting a claim in the Intercreditor Action it should have advanced as a compulsory counterclaim in the Foreclosure Action. *Id.* at 22:12–16 (noting that QR's claims

against LV under the Intercreditor Agreement should "have been brought . . . in the foreclosure case," rather than in a "separate action"). The state court also denied QR's motion for leave to amend "as futile." *Id.* at 21:19–24. The state court, however, did not "mak[e] a ruling as to whether it's too late or not [for QR to bring its claims] in the foreclosure case[.]" *Id.* at 22:17–19. As a result of the dismissal, the *lis pendens* was "automatically dissolved." *Id.* at 22:2–4.

The state court confirmed these findings in two written orders. In the Final Order of Dismissal Granting [LV's] Motion to Dismiss [State Intercreditor DE No. 69], the state court "ORDERED and ADJUDGED that Defendant [LV's] Motion to Dismiss is GRANTED. Leave to amend the Complaint is denied as futile. [QR's] Notice of Lis Pendens and Amended Notice of Lis Pendens are DISSOLVED." And, in its Order Denying [QR's] Motion for Leave to File Amended Complaint [State Intercreditor DE No. 71], the state court held that QR's "Motion for Leave to File Amended Complaint is DENIED without prejudice to the extent [QR] seeks to pursue the claims it raised in [its] Motion for Leave to File Amended Complaint . . . in the *related* foreclosure action . . . . (This ruling in no way implies that such filing would be appropriate or proper at this time.)." On March 14, 2022, QR filed a Motion for Rehearing on Order Granting [LV's] Motion to Dismiss *and* Order Denying QR's Motion for Leave to File Amended Complaint [State Intercreditor DE No. 74], but the state court denied that motion without explanation, *see* Order Denying [QR's] Motion for Reconsideration [State Intercreditor DE No. 78].

With the Intercreditor Action closed, on March 28, 2022, QR tried to append its claim that LV breached the Intercreditor Agreement to the state Foreclosure Action. *See* Motion to Vacate Corrected Agreed Order on [QR's] Motion to Dismiss Case as Moot and Motion for Leave to File Amended Complaint [State Foreclosure DE No. 57]. QR argued that its "narrow request for relief aims to provide QR a pathway to pursue its meritorious claim against LV after dismissal of [the related

Intercreditor Action]." *Id.* at 1. Four months later, on July 26, 2022,[10] the state court denied that motion. *See* Order Denying Motion to Vacate Corrected Agreed Order on [QR's] Motion to Dismiss Case as Moot and Motion for Leave to File Amended Complaint [State Foreclosure DE No. 64]. According to the state court, "QR is not entitled to the relief sought and, even if it were, the Court finds that filing an amended complaint would be futile." *Ibid.* QR then appealed these adverse rulings (from both state proceedings) to Florida's Third DCA.[11]

**VI.    LV files a motion in the Bankruptcy Court to enforce the Sale Order**

We pick up where we left off with the federal proceedings—on January 11, 2022, shortly after QR first filed a notice of *lis pendens* on the Property in the state Intercreditor Action. LV moved—in the Bankruptcy Court—"(a) [for] entry of an order enforcing the Sale Order . . . , and (b) to hold [QR and its counsel] in civil contempt for violation of the Sale Order by filing a *lis pendens* against the Property[ ] and for asserting *in rem* claims for 'equitable lien' and 'specific performance' against the Property in order to interfere with LV's rights and cloud LV's free and clear title to the Property." Motion to Enforce Order Authorizing Sale of Real Property (the "Motion to Enforce") [ECF No. 13-17] at 1. "The main crux" of LV's arguments in its Motion to Enforce was that the "remedies" QR had sought in state court—including the filing of the *lis pendens*—were "forms of 'in rem' relief." QR Initial Brief at 26.

QR opposed the Motion to Enforce, arguing that "nothing QR has done in state court violates the Sale Order" because "QR is not asserting any 'in rem' claims against the real property itself." QR's

---

[10] This was roughly three weeks *after* the MTD before us became ripe.
[11] These adverse rulings were the Final Order of Dismissal and the Order Denying [QR's] Motion for Leave to File Amended Complaint, *see* Amended Notice of Appeal [State Intercreditor DE No. 80], and the Order Denying Motion to Vacate Corrected Agreed Order on [QR's] Motion to Dismiss Case as Moot and Motion for Leave to File Amended Complaint, *see* Notice of Appeal [State Foreclosure DE No. 65]. The Third DCA consolidated these two cases. *See* Third DCA Consolidation Order [State Foreclosure DE No. 69 and State Intercreditor DE No. 87].

Memorandum in Opposition to [LV's] Motion to Enforce Sale Order [ECF No. 13-18] at 1–2. LV filed a Reply in Support of its Motion to Enforce [ECF No. 13-19] on February 10, 2022. The parties' arguments were essentially precursors to the arguments they would make to us in their appellate briefs.

The Bankruptcy Court held a hearing on the Motion to Enforce on February 14, 2022. *See* Motion to Enforce Hearing Transcript [ECF No. 13-20]. During that hearing, the Bankruptcy Court "referred to Paragraph[s] N [and 10] of the Sale Order as a bar on the remedies sought by QR against LV in the State Court case and the filing of the lis pendens on LV's interest in the Property." QR Initial Brief at 27 (citing Motion to Enforce Hearing Transcript at 19:15–17 and 46:4–9).[12] The Bankruptcy Court did, however, acknowledge that QR's claims against LV were not "successor liability" claims and that QR was "not holding LV liable as successor." Motion to Enforce Hearing Transcript at 44:25–45:3. But, turning to the rights QR had tried to "preserve" during the Sale Hearing, the Bankruptcy Court noted that QR's counsel "did not say anything about asserting equitable lien claims or seeking to or filing a notice of *lis pendens* to secure enforcement of a damage claim that might or might not be awarded in state court." *Id.* at 45:25–46:9.

On February 22, 2022, the Bankruptcy Court entered its Order, Granting in Part, the Motion to Enforce (the "Enforcement Order") [ECF No. 13-21]. In that order, the Bankruptcy Court quoted paragraph 10 of the Sale Order (in its entirety) as its basis for finding that "QR violated the terms and intent of the Sale Order by filing a *lis pendens* to cloud title to the Property and by seeking entry of a judgment on specific performance and equitable lien counts." Enforcement Order at 5–6.[13] The Bankruptcy Court therefore "enjoined" QR "from filing a *lis pendens*, equitable lien claim, or a specific performance claim pertaining to the Property and further [enjoined QR] from taking any other action

---

[12] We've reproduced these paragraphs above. *See ante*, at 9–10.
[13] The Bankruptcy Court did not find "that QR or its counsel engaged in bad faith conduct and, on the present record, does not find cause to hold either QR or its counsel in civil contempt." Enforcement Order at 6.

to acquire or encumber the Property." *Id.* at 6. The Bankruptcy Court clarified, though, that "[n]either the Sale Order nor this Order restricts QR from seeking post-judgment relief against the Property if QR obtains an *in personam* judgment against LV." *Ibid.*

## VI.    QR appeals the Enforcement Order

On March 8, 2022, QR timely filed a Notice of Appeal from the Bankruptcy Court [ECF No. 1], challenging the Enforcement Order. According to QR, "[t]he Bankruptcy Court abused its discretion in its interpretation of the Sale Order because when entering the Enforcement Order, the Bankruptcy Court went beyond what the actual language of the Sale Order prohibited. The Bankruptcy Court adopted an overly expansive view of what 'in rem' means, blurred the distinction between in rem claims and remedies for in personam claims and mistakenly viewed the lis pendens QR had filed as an instrument imposing a lien on the Property." QR Initial Brief at 14. "The Bankruptcy Court's interpretation of the Sale Order is not reasonable," QR continues, because "[i]t is contrary to the relief requested in the Sale Motion, the Bankruptcy Court's prior Orders and statements, the Debtors' counsel's in-court statements, and LV's counsel's in-court statements." *Id.* at 15. QR also argues that the Enforcement Order "violates bankruptcy law" because it "results in a bar order and the release of claims against LV, a non-debtor third-party[.]" *Ibid.* QR therefore asks that the "Enforcement Order . . . be overturned." *Ibid.*[14]

## VII.    LV sells the Property and files the Motion to Dismiss Appeal as Moot

LV sold the Property on May 13, 2022. *See* Special Warranty Deed [ECF No. 15] at 30–36. Then, on June 8, 2022, LV filed its Motion to Dismiss Appeal as Moot (the "MTD") [ECF No. 15]. In that MTD—which we resolve here—LV contends that "this Appeal is moot because reversal of the Enforcement Order would not afford QR with any meaningful relief in light of LV's sale of the

---

[14] LV filed its Response Brief [ECF No. 21] on July 15, 2022, and QR filed its Reply [ECF No. 24] on August 12, 2022.

Property to a third party purchaser." MTD at 2. Plus, LV says, "the *lis pendens* was dissolved as a result of the dismissal by the State Court of QR's breach of contract claim without leave to amend and, as a result of the denial of leave to amend, the State Court did not allow QR to proceed with the specific performance and equitable lien counts." *Id.* at 3. Although LV notes that QR "has appealed the dismissal of its breach of contract claim to the Third [DCA] and is separately seeking to revive its breach of contract claim as a counterclaim in the Foreclosure Action that was previously dismissed at QR's request," *id.* at 3, LV concludes that, "[b]ecause LV no longer owns the Property (and, separately, because QR no longer has a live claim), even if the Enforcement Order were reversed as QR requests, the Property would no longer be subject to the filing of a *lis pendens* based on any claims against LV, nor would it be possible for the State Court to order LV to specifically perform an alleged purchase option or to encumber the Property with an equitable lien." *Id.* at 3–4.

QR filed its MTD Response on June 27, 2022. In it, QR contends that LV's "mootness argument turns in large part on whether the buyer [Integra Real Estate, LLC ('Integra')] is a bona fide purchaser. [LV] has not even addressed this critical issue, and there is no record before this Court upon which to make that determination." MTD Response at 3. According to QR, "in order to grant meaningful relief" on its appeal, "this Court merely needs to determine that the Bankruptcy Court did not correctly and reasonably interpret the Sale Order [in its Enforcement Order]." *Ibid.* "If this Court so concludes, the state court can then determine, *based on a full factual record*, which may require discovery, whether the sale of the Property by Appellee to Integra eliminates the possibility of [QR] obtaining specific performance of an option and/or the imposition of an equitable lien." *Ibid.* (emphasis in original).

QR tries to substantiate its allegation that Integra may not be a bona fide purchaser by suggesting that, "based on press reports, the buyer, or at least the buyer group, includes Integra, an entity that originally entered into a sale contract to purchase the Property in the underlying bankruptcy

case for [\$25.5 million]." *Id.* at 3–4. "Unfortunately for the creditors in the bankruptcy case, including [QR], . . . Integra, without providing any reason, abruptly exercised its termination rights in the sale contract and no other third-party submitted a bid to purchase the Property in an amount that met [LV's] requirements." *Id.* at 4. LV, "the first mortgage holder, acquired the Property for a nominal credit bid . . . , the creditors got nothing, and the Chapter 11 case was dismissed." *Ibid.* "As a result of these events, two things happened. One, Integra got the Property for [\$2.5 million] less than it had offered to pay under the sale contract it executed during the bankruptcy process. Two, [LV] obtained [\$3.4 million] more in sale proceeds than it would have obtained if the bankruptcy sale to Integra had gone through. The reason for this is that, as part of the bankruptcy sale process, Integra had agreed to accept [\$19.6 million] in full satisfaction. The surplus would have been available to pay [QR] and other creditors." *Ibid.*

QR, in short, maintains that, *if* it's successful in this appeal, and *if* it's then successful in *either* appending its intercreditor claims to the state Foreclosure Action *or* appealing the dismissal of the intercreditor claims to the Third DCA, and *if* it can finally establish in the state court that Integra was not a "bona fide purchaser because it had notice of [QR's] claims to the Property when it purchased same," then "[QR] will seek many of [the] same rights and remedies against [Integra] that it will seek against [LV]." *Id.* at 4–5. In QR's view, then, "this Court by reversing the Enforcement Order can still grant meaningful relief to [QR] by overturning the Enforcement Order and this appeal is not moot." *Id.* at 5.

In its MTD Reply, LV says that QR has tried "to broaden the scope of [its] appeal" by asking us for "an advisory opinion as to the availability under the Sale Order (which was not appealed) of hypothetical remedies in respect of future claims allegedly 'being investigated' against the new owner—a third party not before the Court." MTD Reply at 2–3. "This shifting position ignores that the Enforcement Order, by its terms, only concerns claims against LV." *Id.* at 3. This new approach,

LV continues, "highlight[s] that, despite [QR's] protestations to the contrary, QR is and was always attempting to assert claims against the Property (a.k.a. *in rem* claims) in violation of the Sale Order." *Id.* at 7.

### VIII.   QR loses its appeals in the Third DCA

On May 10, 2023, after the parties had fully briefed this bankruptcy appeal—and after LV's MTD had ripened—the Third DCA affirmed the state court's decisions in *both* the Foreclosure Action *and* the Intercreditor Action. *See* Mandate from Third DCA [State Foreclosure DE No. 72]; *see also* Mandate from Third DCA [State Intercreditor DE No. 91].[15]

\* \* \*

Against this extensive backdrop, we must resolve only one question: Would our reversal of the Enforcement Order redress QR's injury? If it wouldn't, we must grant the MTD and dismiss QR's appeal as moot.

### ANALYSIS

The U.S. Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies[.]'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). "Setting apart the 'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III—serving to identify those disputes which are appropriately resolved through the judicial process—is the doctrine of standing." *Id.* at 560 (cleaned up). To establish standing under Article III, a plaintiff must have suffered an "injury

---

[15] In affirming the state trial court's decision in the Foreclosure Action (No. 20-18857), the Third DCA wrote only this: "Affirmed. *See Johnson v. State, Dep't of Revenue ex rel. Lamontagne*, 973 So. 2d 1236 (Fla. 1st DCA 2008); *State Farm Mut. Auto. Ins. Co. v. Isom*, 681 So. 2d 1170, 1172 (Fla. 5th DCA 1996)." Similarly, in affirming the state trial court's decision in the Intercreditor Action (No. 21-18152), the Third DCA wrote: "Affirmed. *See* Rule 1.170(a), FLA. R. CIV. P.; *Londono v. Turkey Creek, Inc.*, 609 So. 2d 14, 19 (Fla. 1992) ("A compulsory counterclaim is 'a defendant's cause of action arising out of the transaction or occurrence that formed the subject matter of the plaintiff's claim.'"); *Orix Capital Mkts., LLC v. Park Ave. Assocs., Ltd.*, 881 So. 2d 646, 650 (Fla. 1st DCA 2004) ("A primary consequence of a party's failure to assert a compulsory counterclaim is that such failure 'constitutes a waiver of the [party's] right to recover on it.'"); *Floridian Cmty. Bank, Inc. v. Bloom*, 25 So. 3d 43, 45 (Fla. 4th DCA 2009)."

in fact" that's "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010); *see also In re Bay Circle Props., LLC*, 955 F.3d 874, 877 (11th Cir. 2020) (noting—in the context of bankruptcy appeals—that "[w]e analyze three elements for Article III standing" (cleaned up)). It's the last standing element—redressability—that's relevant here.

"In order to establish that it has constitutional standing to bring a suit, a 'plaintiff must show . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Serv.*, 528 U.S. 167, 180–81 (2000)). And, "for . . . *Appellants* to show that they have standing *on appeal*, they must demonstrate that their alleged injury will be redressed by a favorable decision." *Id.* at 1303 (cleaned up & emphasis added). "Redressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Id.* at 1304.

And a plaintiff (or appellant) must maintain its standing throughout the life of a case. *See Corley v. Long-Lewis, Inc.*, 965 F.3d 1222, 1233 (11th Cir. 2020) ("'To have a case or controversy, a litigant must establish that he has standing, which must exist throughout all stages of litigation,' including on appeal." (quoting *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019))); *see also Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994) ("Standing represents a jurisdictional requirement which is open to review at all stages of the litigation."). "The doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021).[16] For this reason,

---

[16]     When it comes to "bankruptcy proceedings, which 'often involve numerous creditors who are dissatisfied with any compromise that jeopardizes the full payment of their outstanding claims against the bankrupt,' special rules have been developed to govern which parties may appeal a bankruptcy order.'" *In re Ernie Haire Ford, Inc.*, 764 F.3d 1321, 1324–25 (11th Cir. 2014) (quoting *In re Westwood Cmty. Two Ass'n*, 293 F.3d 1332, 1334 (11th Cir. 2002)). "Under § 39(c) of the now-repealed Bankruptcy

some courts have referred to "mootness as the doctrine of standing set in a time frame," even though the two concepts aren't identical. *Friends of the Earth*, 528 U.S. at 170 (cleaned up). Like questions of standing generally, other "questions of jurisdiction such as mootness can appropriately be raised at any time in the litigation." *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health and Rehab. Serv.*, 225 F.3d 1208, 1218 (11th Cir. 2000) (cleaned up). "Our jurisdiction ceases if a case becomes moot while it pends before us." *Keister v. Bell*, 29 F.4th 1239, 1250 (11th Cir. 2022). And it's the party asserting mootness who "bears the burden to establish that a once live case has become moot," *West Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2607 (2022), although the issue of mootness can be "confront[ed]"

---

Act of 1898, only a 'person aggrieved' could appeal from an order of the bankruptcy court." *Id.* at 1325 (quoting *In re Westwood Cmty. Two*, 293 F.3d at 1335 & n.2). And, while the now-operative Bankruptcy Reform Act of 1978 (the "Bankruptcy Code") "does not include a similar provision limiting who can appeal, courts continue to apply the person aggrieved standard because 'Congress did not intend to alter the definition set forth in the prior law.'" *Ibid.* (quoting *In re Westwood Cmty. Two*, 293 F.3d at 1334 (cleaned up)). The Eleventh Circuit has therefore "adopted the person aggrieved doctrine as [its] standard for determining whether a party can appeal a bankruptcy court's order." *Ibid.* Under this standard, "the right to appeal a bankruptcy court order [is limited] to those parties having a direct and substantial interest in the question being appealed." *Ibid.* (cleaned up). "Aggrieved persons" are those "individuals who are directly, adversely, and pecuniarily affected by a bankruptcy court's order." *Ibid.* (cleaned up). "An order will directly, adversely, and pecuniarily affect a person if that order diminishes their property, increases their burdens, or impairs their rights." *Ibid.* (quoting *In re Westwood Cmty. Two*, 293 F.3d at 1338). "[T]he person aggrieved standard does not speak to a court's subject-matter jurisdiction. Rather, it tells us which parties may appeal from a bankruptcy court order." *In re Ernie Haire Ford*, 764 F.3d at 1325 n.3 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014)).

LV doesn't dispute that QR met the "person aggrieved" standard when it brought this appeal. *See generally* MTD (never mentioning the "person aggrieved" standard). That's probably because QR appealed the Enforcement Order to us on March 8, 2022, *see* Notice of Appeal [ECF No. 1]—*before* LV sold the property to Integra on May 13, 2022, *see* Special Warranty Deed [ECF No. 15] at 30–36. And, as we've discussed, LV grounds its mootness argument in that sale. *See ante*, at 18. Still, we think an argument could be made that QR *didn't* meet the "person aggrieved" standard because it had no live state-court claims when it appealed the Enforcement Order. *See* MTD at 7 ("After a hearing on February 14, 2022, the State Court dismissed QR's Complaint as stating a compulsory counterclaim that should have been raised in the Foreclosure Action and denied QR leave to amend. As a result of the dismissal, the *lis pendens* was dissolved by operation of law."). But LV hasn't made this argument, and we won't make it on LV's behalf. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *see also Wells v. Gourmet Serv. Inc.*, 778 F. App'x 853, 854 (11th Cir. 2019) ("[W]e will not make arguments for the parties, and issues not briefed are therefore deemed abandoned.").

*sua sponte* by the court because it "implicates our jurisdiction," *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 537 (1978).[17]

Redressability is an essential element of any mootness analysis. *See Ga. Ass'n of Latino Elected Off. v. Gwinnett Cty. Bd. of Registration and Elections*, 36 F.4th 1100, 1113 (11th Cir. 2022) ("If a case no longer presents a live controversy with respect to which the court can give meaningful relief, the case is moot and must be dismissed." (cleaned up)); *see also Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) ("A case must be dismissed as moot if events that occur subsequent to the filing of a lawsuit deprive the court of the ability to give the plaintiff meaningful relief." (cleaned up)). As other circuits have noted, "the crucial question [with mootness] is whether granting a present determination of the issues offered will have some effect in the real world." *Pier v. Steed*, 456 F.3d 1209, 1213 (10th Cir. 2006) (cleaned up); *see also Nat'l Labor Relations Bd. v. Constellium Rolled Prod. Ravenswood, LLC*, 43 F.4th 395, 402 (4th Cir. 2022) ("To have meaning in the real world, Article III requires that a judgment issued by this court have some effect in the world, that it will cause real and immediate action or inaction by one of the parties that otherwise would not occur."). A finding of mootness, though, "is limited to cases where 'it is *impossible* for a court to grant *any* effectual relief, [and] as long

---

[17]     There are two other varieties of mootness in the bankruptcy context—equitable and statutory—but neither is applicable here. "Equitable mootness is, as the name suggests, a doctrine of equity that moots an appeal because of (1) the effects of a reversal on third parties who have relied on a bankruptcy court's order or (2) the complexity and difficulty of unwinding a contested transaction. If a third party has altered its position in reliance on a bankruptcy court's order or a transaction is simply too complex or difficult to unwind, an appeal may be moot as a matter of equity." *In re Stanford*, 17 F.4th 116, 121 (11th Cir. 2021). Here, even a favorable decision for QR wouldn't affect LV or Integra (at least not yet). And QR isn't asking *us* to unwind anything.
        "Statutory mootness is not based on the impossibility or inequity of relief, but the preclusion of relief under a statute. [11 U.S.C. § 363(m)] precludes an appellate court from reversing or modifying a bankruptcy court's authorization of a sale of a bankruptcy estate's property to someone who 'purchased . . . such property in good faith' under Section 363(b) or (c) unless the sale was 'stayed pending appeal.' In other words, once a sale is approved by the bankruptcy court and consummated by the parties, the bankruptcy court's authorization of the sale cannot be effectively altered on appeal." *Ibid.* (quoting 11 U.S.C. § 363(m) (cleaned up)). QR is *only* challenging the Bankruptcy Court's Enforcement Order—not the property sale (by credit bid) to LV. And, while QR *is* questioning the propriety of the sale to Integra, it isn't challenging that sale here.

as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.'" *Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 733 (11th Cir. 2018) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)).

QR's appeal is plainly moot. Again, just a few weeks after LV's MTD ripened here, the State Foreclosure Court *denied* QR's attempt to append its intercreditor claims to that inactive case. *See* Order Denying Motion to Vacate Corrected Agreed Order on [QR's] Motion to Dismiss Case as Moot and Motion for Leave to File Amended Complaint [State Foreclosure DE No. 64] ("QR is not entitled to the relief sought and, even if it were, the Court finds that filing an amended complaint would be futile."). And then, on May 10, 2023, Florida's Third DCA *rejected* QR's consolidated Intercreditor and Foreclosure Appeals in a pair of *per curiam* affirmances. *See* Mandate from Third DCA [State Foreclosure DE No. 72]; *see also* Mandate from Third DCA [State Intercreditor DE No. 91]. Because QR hasn't sought discretionary review from the Florida Supreme Court, *see generally* State Intercreditor and State Foreclosure Dockets,[18] it now has *no mechanism* to seek redress in *any* state court. So, even if we were to grant QR the relief it's asking for here, there's *nothing* QR could do with that relief. Our decision, in short, would be a meaningless advisory opinion. *Djadju v. Vega*, 32 F.4th 1102, 1108 (11th Cir. 2022) ("Any decision on the merits of a moot case or issue would be an impermissible advisory opinion." (cleaned up)). That's pretty much the end of that.

But here's the thing: This appeal was already moot *even before* the Third DCA affirmed the state trial court's decisions because, by the time LV's MTD in our case became ripe (if not earlier), we *couldn't* "grant [QR] *any* effectual relief." *Gagliardi*, 889 F.3d at 733 (quoting *Chafin*, 568 U.S. at 172). In other words, *even back then*, a favorable decision from us would've had no "effect in the real world,"

---

[18] Nor could it have sought such review. *See Grate v. State*, 750 So. 2d 625, 626 (Fla. 1999) ("In *Jenkins v. State*, 385 So. 2d 1356, 1359 (Fla. 1980), this Court held that it does not have jurisdiction to review a per curiam affirmed decision without a written opinion where the basis for review is an alleged conflict between that decision and an opinion issued by either this Court or another district court of appeal.").

*Pier*, 456 F.3d at 1213, because QR couldn't "show it [was] likely, as opposed to merely speculative, that the injury w[ould] be redressed by a favorable decision," *Fla. Wildlife Fed'n*, 647 F.3d at 1302. Even with a favorable decision from us, after all, QR would've still needed, putting aside the Third DCA's rulings, to prevail in *two separate* state-court cases *before* it could get the relief it was here seeking. *First*, QR would've needed to prevail *either* on its motion to reopen the State Foreclosure Action (in which QR sought leave to append its intercreditor claims to the Foreclosure Action)[19] *or* on its appeal to the Third DCA to reverse the state trial court's dismissal of the Intercreditor Action—either of which would have merely resuscitated QR's state-court claims. *Second*, now back before the state trial court, QR would've needed to persuade the court that Integra wasn't a *bona fide* purchaser of the Property— and that QR should therefore be permitted to assert against Integra the claims it had once advanced against LV. *See* MTD Response at 19 ("Under Florida law, [Integra] was aware of [QR's] specific performance claims [against LV] and thus, not a bona fide purchaser of the Property, [Integra's] interest in the Property is still subject to the remedy of specific performance."). As we've seen from how all this has played out in state court, the likelihood of QR succeeding in any one of these tasks was miniscule—and its chances of prevailing on *all of them* were infinitely smaller. That's just too attenuated—and speculative—a chain of events to sustain our Article III jurisdiction.

On this point, we find two decisions from the D.C. Circuit instructive. We'll start with *Daimler Trucks North America LLC v. Environmental Protection Agency*, 745 F.3d 1212 (D.C. Cir. 2013). In that case, Daimler—a diesel-engine manufacturer—petitioned the court for review, "on both procedural and substantive grounds," of an EPA interim final rule that allegedly (and impermissibly) benefitted a competitor, Navistar. *Id.* at 1213. After Daimler filed its petition, however, the EPA promulgated a new rule, meaning that the challenged regime ceased "to have any effect whatsoever." *Ibid.* The EPA

---

[19] Again, this was QR's Motion to Vacate Corrected Agreed Order on [QR's] Motion to Dismiss Case as Moot and Motion for Leave to File Amended Complaint [State Foreclosure DE No. 57]. *See ante*, at 14–15.

thus argued that Daimler "lack[ed] standing . . . because the challenge [was] now moot." *Id.* at 1215. Daimler countered that a favorable decision from the court "would make it likely that Daimler would receive redress for their past economic injuries, either through an EPA enforcement action against Navistar or in a citizen enforcement action brought by Daimler." *Id.* at 1217 (cleaned up). The court disagreed, finding that Daimler's challenge was moot because "the prospect of such relief [in either of those two cases] is unduly speculative." *Ibid.*

Like Daimler, QR acknowledges that nothing we do will—standing alone—have any concrete effect on the parties. Instead, even more so than in *Daimler*, a favorable decision from us would've represented, *even before* the Third DCA eviscerated QR's chances, just one step in a long and uncertain journey to redress. When QR appealed the Enforcement Order to us, after all, it had *already* lost both of the pending state-court cases it was relying on. To continue down the winding road towards unlikely relief, therefore, QR would have needed, after prevailing here, *multiple victories* in different state courts—a degree of adversity even the *Daimler* Plaintiff obviously did not face.

Consider also *University Medical Center of South Nevada v. Shalala*, 173 F.3d 438 (D.C. Cir. 1999). There, a hospital sued in district court, "seeking a declaratory judgment that" the Department of Health and Human Services ("HHS") was "arbitrary and capricious" in not adding the hospital to a list that would've entitled it to discounted drugs. *Id.* at 440. HHS countered that the hospital "lacked standing because the ultimate relief it seeks—retroactive discounts—cannot be gained by a judgment against the government." *Ibid.* The district court ruled for HHS—but not on those grounds. *Ibid.* On appeal, however, the D.C. Circuit agreed with HHS that whether the hospital "can get the retroactive discounts apparently depends on whether the [drug] manufacturers—who are not parties to this action—could be persuaded to pay them—presumably based on their contract with HHS to which [the hospital] is not even a party." *Id.* at 441–42. The hospital was suggesting that "it should be allowed to seek redress in two steps, first getting a declaratory judgment and then suing manufacturers." *Id.* at

442. "But," the court explained, "that is essentially a concession that the redressability requirement cannot currently be met. Redressability must be satisfied *now* to establish jurisdiction." *Ibid.*[20]

As in *University Medical Center*, QR wanted—even before the Third DCA eliminated its chances of success in state court—to "seek redress in two steps." *Ibid.* Again, however, QR's redressability arguments are even weaker than the hospital's were in *University Medical Center.* In that case, after all, the hospital only needed *one* post-judgment decision to go its way: It needed the drug manufacturers to provide certain discounts. Here, by contrast, by the time LV's MTD ripened, QR already needed *two* future wins: *first*, either a favorable decision on its long-shot motion in the State Foreclosure Action or a reversal in its appeal to the Third DCA; and *second*, a victory in the state trial court, where it would bear the burden of showing that Integra wasn't a *bona fide*, third-party purchaser. As in *University Medical Center*, "that is essentially a concession that the redressability requirement cannot currently be met" because "[r]edressability must be satisfied *now* to establish jurisdiction." *Ibid.* (emphasis added).

Before closing, we'll mention one more case that, in its own way, helps us highlight some of the mootness problems we're confronting here. In *South Miami Holdings, LLC v. Federal Deposit Insurance Corp.*, 533 F. App'x 898 (11th Cir. 2013), the plaintiff (South Miami Holdings) sued a bank in state court for, among other things, breach of contract and negligent misrepresentation. *Id.* at 899. While the case was pending, the bank collapsed, and the FDIC was appointed as its "receiver." *Ibid.* The FDIC removed the case to federal court and eventually issued a "No-Value Determination," meaning that there were no assets for South Miami Holdings to recover. *Id.* at 900. The FDIC then "moved the district court to dismiss [South Miami Holdings's] suit for lack of subject matter jurisdiction due

---

[20] The court did accept that, "[i]f . . . [the hospital] was *legally entitled* to get the discounts as a result of being placed on the list . . . , then we might have a different situation. That would force us to ask how likely it was that appellant would succeed in the second suit." *Univ. Med. Ctr.*, 173 F.3d at 442. That's precisely the analysis the court undertook in *Daimler*—peeking at the merits of the EPA and citizen-enforcement actions to assess the likelihood of success in those future suits. *Daimler*, 745 F.3d at 1217. And that's what we've done here: finding that QR is (to say the least) *very* unlikely to succeed in any of its state cases.

to mootness" on the ground that "the inability of [South Miami Holdings] to ever recover from [the FDIC] meant that there was no live case or controversy between the parties[.]" *Id.* at 901. South Miami Holdings opposed the motion, although it "did not contend that it could ever recover on a judgment against the FDIC. Instead, [South Miami Holdings] stated that it could pursue a separate action under [Florida law] against [a non-party] which acquired [the bank's] deposit liabilities and assets[.]" *Ibid.* According to South Miami Holdings, "it could not pursue appropriate discovery on [that state-law claim] without first establishing itself as a creditor of the FDIC as receiver" in federal court. *Ibid.* The district court didn't buy this argument, and neither did the Eleventh Circuit. *See id.* at 901–02. In the Circuit's view, "even assuming *arguendo* that (1) [South Miami Holdings] obtained a judgment in its favor on its claims against the FDIC in the present case, and (2) [South Miami Holdings] could pursue [the third party] in a separate [state court] action . . . , this speculative sequence of events does not satisfy the redressability requirement. This is because [South Miami Holdings] could pursue a claim (if it has one) against [the third party] even without obtaining a judgment against the FDIC." *Id.* at 905. In other words, relief in federal court was *neither* a necessary *nor* a sufficient condition for South Miami Holdings to have its injuries redressed.

Our situation is similar. QR said it *needed* a favorable decision from us just to have *a chance* at pursuing its claims in state court. *See* MTD Response at 3 ("Come what may, [QR] merely wants to have a *chance* to have its day in state court."). But that wasn't entirely true. QR's appeals to the Third DCA turned on purely state-law questions—*viz.*, whether the claims QR advanced in the Intercreditor Action were compulsory counterclaims it should've raised in the Foreclosure Action. *See ante*, at 20 n.15. And the proof, as it were, is in the pudding. None of the five cases the Third DCA cited in its two *per curiam* affirmances had anything to do with bankruptcy—much less the distinction, so relevant here, between *in personam* and *in rem* claims. So, a decision from us parsing the nuances of *in personam*

and *in rem* claims would have been of no use to QR in its efforts to resurrect its state-law claims. And that decision is certainly of no use now that QR has no state-law claims to resurrect.

* * *

Which is all in the way of saying that there was nothing we could have done to redress QR's (alleged) injury *even when* the MTD became ripe. And this is doubly true now that Florida's Third DCA has foreclosed whatever tortuous path to relief QR may once have had in state court. We therefore **ORDER and ADJUDGE** as follows:

1. LV's Motion to Dismiss Appeal as Moot [ECF No. 15] is **GRANTED**.

2. QR's Appeal [ECF No. 1] is **DISMISSED**.

3. This case shall remain **CLOSED**. All pending deadlines and hearings are **TERMINATED**, and any pending motions are **DENIED AS MOOT**.

**DONE AND ORDERED** in the Southern District of Florida on April 12, 2024.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

29